UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:23-cr-00087-JAW-1 |
| | ) | |
| STEVEN SAYLES | ) | |
| | ) | |

**ORDER ON MOTION TO SUPPRESS**

A criminal defendant moves to suppress his statements to law enforcement immediately following his arrest and evidence seized from a residence in which he has a reasonable expectation of privacy, alleging officers failed to give him *Miranda* warnings before asking incriminating questions in a custodial setting and violated his Fourth Amendment rights by entering the residence without a search warrant. Concluding the defendant's statements are admissible pursuant to the public safety exception to *Miranda* and the contested evidence would have been inevitably discovered, the court dismisses the defendant's suppression motion.

## I. BACKGROUND

### A. Procedural Background

On August 23, 2023, a federal grand jury indicted Steven Sayles on one count of distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1). *Indictment* (ECF No. 3). The indictment was superseded on July 25, 2024; the superseding indictment charged Mr. Sayles with distribution of fentanyl in violation of 21 U.S.C. § 841(a)(1) (Count One), possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Count Two), possession of firearms in

furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three), and felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1)(Count Four). *Superseding Indictment* (ECF No. 27). The superseding indictment included two forfeiture allegations. *Id.* at 3-5. On August 1, 2024, Mr. Sayles entered a plea of not guilty as to all counts in the superseding indictment. *Min. Entry* (ECF No. 32).

On April 15, 2025, the Defendant filed a motion to suppress statements he made to law enforcement on the day of his arrest as well as evidence officers seized from a residence in which he has a reasonable expectation of privacy on the same day. *Mot. to Suppress Evid.* (ECF No. 74) (*Def.'s Mot.*).[1] The Government opposed his suppression motion on May 15, 2025. *Gov't's Resp. in Opp'n to Def.'s Mot. to Suppress Evid.* (ECF No. 82) (*Gov't's Opp'n*). On June 23, 2025, Mr. Sayles replied. *Def.'s Reply to Gov't's Resp. in Opp'n to Def.'s Mot. to Suppress* (ECF No. 97) (*Def.'s Reply*). At a telephone conference of counsel on July 17, 2025, counsel requested a hearing on the suppression motion. *Min. Entry* (ECF No. 107). Upon consent motions or Mr. Sayles's motion, the Court continued the hearing three times. *Order* (ECF No. 115); *Order* (ECF No. 118); *Order* (ECF No. 127). On April 2, 2026, the Court held an evidentiary hearing and oral argument on Mr. Sayles's motion to suppress. *Min. Entry* (ECF No. 131).

---

[1]    Mr. Sayles additionally filed motions to compel, to sever, and for discovery. *Def.'s Omnibus Pretrial Mots.* (ECF No. 73); *Def.'s Mot. for Relief from Misjoinder and for Severance* (ECF No. 75); *Def.'s Mot. for Disc.* (ECF No. 76). On August 18, 2025, the Court issued an order dismissing, without prejudice, Defendant's motion to sever. *Order on Mot. for Relief from Misjoinder and for Severance* (ECF No. 111). The United States and Defendant moved to withdraw the other two motions, *Joint Mot. to Withdraw and/or Deny as Moot, Without Prejudice, Def.'s Omnibus Mot. and Mot. for Discovery* (ECF No. 112), which the Court granted. *Order* (ECF No. 113).

The official hearing transcript was filed April 23, 2026.  *Tr. of Proceedings, Suppression Hr'g* (ECF No. 134) (*Suppression Tr.*).  On May 12, 2026, the Defendant filed his post hearing motion.  *Def.'s Suppl. Mot. to Suppress* (ECF No. 137) (*Def.'s Suppl. Mot.*).  The Government filed its response that day.  *Gov't's Suppl. Response in Opp'n to Def.'s Mot. to Suppress Evid.* (ECF No. 138) (*Gov't's Suppl. Opp'n*).  On May 19, 2026, the Government responded to Mr. Sayles's supplemental motion. *Gov't's Resp. in Opp'n to Def.'s Suppl. Mot. to Suppress Evid.* (ECF No. 139) (*Gov't's Opp'n to Def.'s Suppl. Mot*).

B.    **Factual Background**[2]

On August 23, 2023, the Government requested that the Clerk of Court issue an arrest warrant for the Defendant in this matter.  *Praecipe for Warrant* (ECF No. 5).  The Clerk issued the requested warrant the same day.  *Arrest Warrant Issued* (ECF No. 6). As Mr. Sayles's whereabouts were unknown, law enforcement conducted a fugitive investigation to locate him.  *See* No. 2:24-mj-00080-KFW-1, *Appl. for a Warrant by Tel. or Other Reliable Elec. Means*, Attach. 1, *Aff. in Support of Appl.* at 2-4 (ECF No. 1) (*First Search Warrant Appl.*).  On March 18, 2024, asserting that there was probable cause to believe the Defendant was residing at 34 Charles Street, Unit A in Sanford, Maine (34 Charles Street), Deputy United States Marshal Spencer Christie applied for a warrant to search 34 Charles Street to arrest Mr. Sayles.  *Id.*; *see also id.*, Attach. 1, *Aff. in Support of Appl.* at 4.  A United States Magistrate Judge

---

[2]    Unless otherwise noted, all docket entries in this section are from case no. 2:23-cr-00087-JAW-1.

granted Deputy Christie's request and issued the search warrant on the same day. No. 2:24-mj-00080-KFW-1, *Warrant by Tel. or Other Reliable Elec. Means* (ECF No. 2).

On March 20, 2024, law enforcement officers with the United States Marshals Service, United States Drug Enforcement Administration (DEA), and other state and federal agencies executed the search and arrest warrants at 34 Charles Street. *Gov't's Opp'n*, Attach. 1, *Appl. for a Warrant by Tel. or Other Reliable Elec. Means* at 8 (*Second Search Warrant Appl.*); *Suppression Tr.* 13:13-21. Prior to executing the search warrant, law enforcement officers contacted a female occupant departing from 34 Charles Street who told officers that the Defendant was the only person currently at 34 Charles Street, and she was unsure if there were any firearms inside 34 Charles Street. *Second Search Warrant Appl.*[3]; *Suppression Tr.* 14:19-15:7; 174:10-18; 194:2-9. Law enforcement officers knocked on the door of 34 Charles Street and, when Mr. Sayles answered the door, they arrested him. *Second Search Warrant Appl.*

As law enforcement officers secured Mr. Sayles in handcuffs on the porch of the residence, they inquired if there were any other people inside 34 Charles Street. *Id.* Mr. Sayles did not answer. *Id.*; *Suppression Tr.* 19:23-25; 129:3-18; 146:2-7. Officers next asked if the Defendant was in possession of any firearms, and the Defendant responded that he did not have a firearm on his person. *Second Search Warrant Appl.* Law enforcement then asked if there was a firearm inside 34 Charles

---

[3]      The Defendant identifies this female occupant as Brandi Fitch, the mother of his child and a resident of 34 Charles Street. *Def.'s Mot.* at 4 n.7.

Street, to which Mr. Sayles indicated there was one next to a bed. *Id.*; *Tr. of Proceedings* 18:19-23; 19:20-22; 146:2-7. While effecting Mr. Sayles's arrest, officers allege that they heard voices inside 34 Charles Street. *Second Search Warrant Appl.*; *Suppression Tr.* 99:1-21; 130:8-25. They entered 34 Charles Street and learned that the voices were coming from a television left on inside the property. *Second Search Warrant Appl.* at 8-9; *Suppression Tr.* 107:7-20. Officers also observed a firearm next to a bed. *Second Search Warrant Appl.* at 9; *Suppression Tr.* 148:2-8.

After the protective sweep during which officers found a firearm in plain view, officers asked Mr. Sayles, still in custody on the porch, about any clothing or medical supplies he might need—it was a cold day and the officers understood that Mr. Sayles required a colostomy bag and may not get medical supplies immediately upon booking. *Id.* 22:17-23:20; 148:2-8; 167:14-168:5; 176:3-25. Officers went back inside to retrieve Mr. Sayles's clothes and medical supplies from inside the home. *Id.* 148: 2-24.

Later on the day of Mr. Sayles's arrest, DEA Special Agent Michael Gagnon applied for a warrant to search 34 Charles Street for evidence of a crime—specifically, a violation of 18 U.S.C. § 922, felon in possession of a firearm—and for contraband, fruits of crime, or other items illegally possessed, pursuant to Federal Rule of Criminal Procedure 41(c). *Second Search Warrant Appl.* at 1. Special Agent Gagnon's warrant application describes Mr. Sayles's criminal history, including felony convictions for aggravated assault and unlawful trafficking in scheduled drugs, and misdemeanor domestic violence assault. *Id.* at 9. At the time he applied for the

warrant, Special Agent Gagnon stated he "believes Sayles is prohibited from possessing firearms based on his criminal history." *Id.*

A Magistrate Judge approved Special Agent Gagnon's application the same day, issuing a warrant for the search of 34 Charles Street and for the seizure of firearms and ammunition; firearm accessories, including but not limited to magazines, boxes, scopes, sights, holsters, and cleaning equipment; and documentation related to firearm possession, including but not limited to receipts of purchase or sale of firearms. *Id.* at 1, 3. In conducting the authorized search of 34 Charles Street, officers seized firearms, suspected cocaine base, suspected Amphetamine pills, suspected Gabapentin capsules, suspected Clonazepam pills, suspected Vyvanse pills, suspected Glock switches, one suspected firearm suppressor, one ballistic vest, suspected marijuana, and ammunition. *Def.'s Mot.* at 7.

## II.   THE PARTIES' POSITIONS

### A.   Steven Sayles's Motion to Suppress

The Defendant's suppression motion alleges violations of his rights under the Fourth and Fifth Amendments to the United States Constitution. Concerning the Fourth Amendment, Mr. Sayles argues he has standing to challenge the officers' warrantless search of 34 Charles Street at the time of his arrest on the ground that he "resided at [34 Charles Street], and therefore has a reasonable expectation of privacy in the room and its contents sufficient for the application of the protections of the Fourth Amendment." *Def.'s Mot.* at 7. Anticipating that the Government may invoke the "protective sweep" doctrine, Mr. Sayles preemptively contends that law

enforcement officer's search of 34 Charles Street on the date of his arrest exceeded the scope of this exception to the warrant requirement. *Id.* at 9-13. Concerning the Fifth Amendment, Mr. Sayles argues his statements to law enforcement following his arrest are inadmissible under the Fifth Amendment because law enforcement failed to give *Miranda* warnings prior to a custodial interrogation, which justifies suppression of the resulting statements. *Id.* at 14 (citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)).

### B.    The Government's Response

The Government opposes the Defendant's suppression motion, alleging that, first, law enforcement did not violate Mr. Sayles's Fifth Amendment rights because officers' questions fell within the public safety exception to *Miranda*, and, second, officers' search of 34 Charles Street did not violate Mr. Sayles's Fourth Amendment rights pursuant to, variously, the protective sweep doctrine, the plain view doctrine, and the inevitable discovery doctrine. *Gov't Opp'n* at 5-15.

### C.    Steven Sayles's Reply

Mr. Sayles's reply begins by rejecting the Government's argument that his unwarned custodial statements regarding a firearm inside the residence are admissible under the public safety exception to *Miranda*. *Def.'s Reply* at 1 (citing caselaw). Turning to the Fourth Amendment, Mr. Sayles rejects the Government's argument that the protective sweep doctrine justifies their search of 34 Charles Street, insisting the officers did not have a sufficient articulable facts and rational inferences to warrant the sweep and, even if they did, the officers exceeded the

permissible scope of this doctrine, which is designed to ensure officer safety. *Id.* at 5-7. Turning to the Government's invocation of the inevitable discovery doctrine, Mr. Sayles first argues the Government's assertion that the firearm was in plain view is unsupported. *Id.* at 8. Next, Mr. Sayles insists he could not have voluntarily consented to the search because, on the day of his arrest on March 20, 2024, he "was still in a vulnerable state" on account of a violent assault he experienced on July 28, 2023, "requiring an ostomy bag, supplies, and medications." *Id.* at 9-10 (collecting cases from the Supreme Court and First Circuit addressing factors for determining voluntary consent). Even if he had consented to the Defendants' request, the Defendant argues, the seized items are nonetheless inadmissible because officers exceeded the scope of what Mr. Sayles consented to. *Id.*

Finally, Mr. Sayles challenges the Government's claim that probable cause existed for the search warrant, absent the fruit of the Government's initial entrance into the residence to retrieve the Defendant's shoes and jacket. *Id.* Without Mr. Sayles's statement that there was a firearm in the house, and without Mr. Sayles's consent to enter the residence to retrieve a jacket and shoes, the Defendant argues law enforcement did not have probable cause. *Id.* at 13. Mr. Sayles concludes by urging the Court to grant his motion to suppress. *Id.* at 13-14.

### D.    Steven Sayles's Supplemental Motion to Suppress

In the supplemental motion, Mr. Sayles reiterates his prior arguments and earmarks testimony from the April 2, 2026 evidentiary hearing. *Def.'s Suppl. Mot.* Mr. Sayles contends "law enforcement had no justification for entering and searching"

8

Mr. Sayle's home, yet they "had enough basis to seek a search warrant at the same time they obtained a[n arrest] warrant," so law enforcement "should have obtained a search warrant ahead of time so that their entry into the residence was justified and lawful." *Id.* at 1. Mr. Sayles also argues that law enforcement did not have sufficient grounds to conduct a protective sweep; that it was unreasonable for law enforcement to retrieve his clothing and medical supplies from the residence; and finally, that because law enforcement did not *Mirandize* him before asking about whether there were firearms or other people in the residence, those statements should be suppressed. *Id.* at 1-2.

### 1.    The Government's Opposition

The Government filed a response in opposition to Mr. Sayles's supplemental motion responding to each of the Defendant's arguments. *Gov't's Opp'n to Def.'s Suppl. Mot.* First, the Government argues that on the day of the arrest, officers had only an arrest warrant, but when Mr. Sayles indicated he had a gun in the house, officers had probable cause to search the home and, but for the need to conduct a protective sweep, officers would have sought a search warrant based on Mr. Sayles admission of a firearm alone. *Id.* at 2. The Government also points out that Mr. Sayles is mistaken to assert that officers did not hear noises justifying the protective sweep and cites the transcript. *Id.* at 2-3. Citing to the record, the Government explains how multiple witnesses testified that law enforcement had an obligation to ensure the Defendant was properly clothed and had necessary medical supplies given his extensive injuries. *Id.* at 3. Finally, the Government reasserts that asking Mr.

9

Sayles about the presence of other people and weapons in the residence did not violate his *Miranda* rights because these questions were not solely designed to elicit testimony but were instead meant to ensure officer and public safety. *Id.* at 4-5.

### E.     The Government's Supplemental Response

The Government filed a response in opposition to Mr. Sayles's supplemental motion arguing that because officers heard voices inside the home and Mr. Sayles admitted there was a firearm in the building yet refused to answer whether there were other people in the building, the officers had grounds to conduct a protective sweep for officer safety. *Gov't's Suppl. Opp'n* at 1-3.  Further, even if the officers had not conducted a protective sweep, the officers had probable cause to search the residence because Mr. Sayles indicated there was a firearm in the residence and law enforcement say the firearm was in plain view when legally entering the apartment to retrieve the Defendant's effects. *Id.* at 4.

## III.   DISCUSSION

### A.     The Fifth Amendment Issue

#### 1.     Legal Standard

"In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment . . . commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Bram v. United States*, 168 U.S. 532, 542 (1897).  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established "rules of police procedure applicable to 'custodial

10

interrogation.'" *See Oregon v. Mathiason*, 429 U.S. 492, 494 (1977).  The *Miranda* Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444.  From there, the Court prescribed the eponymous *"Miranda* warning," requiring that any custodial interrogation be preceded with cautionary advice that the suspect has "a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

The *Miranda* warning was deemed necessary to combat the "'compelling pressures' inherent in custodial police interrogation" and safeguard individual's Fifth Amendment right against self-incrimination. *Dickerson v. United States*, 530 U.S. 428, 440 (2000) (quoting *Miranda*, 384 U.S. at 467).  However, for *Miranda* warnings to be required, the individual must be in custody; noncustodial questioning requires no warning. *Mathiason*, 429 U.S. at 495; *accord United States v. Quinn*, 815 F.2d 153, 160 (1st Cir. 1987).  Thus, for Mr. Sayles's suppression motion to succeed on the basis of a *Miranda* violation, he must have been in custody at the time of his unwarned statements. *United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011). Mr. Sayles seeks to suppress his statements made immediately following his arrest; thus, the first question before the Court is whether he was in custody.  Should the Court determine Mr. Sayles was in custody at the time of his statements, the Court

11

next considers whether the law enforcement knew or should have known their questions were "likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

### 2.    Discussion

For a suspect to be in custody, he must be subject to either formal arrest or an equivalent restraint on his freedom of movement. *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *accord Mathiason*, 429 U.S. at 495. The paradigmatic test asks "whether a reasonable person in the circumstances would have felt 'at liberty to terminate the interrogation and leave.'" *United States v. Rogers*, 659 F.3d 74, 78 (1st Cir. 2011) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). Under the reasonable person test, "[a]mong the factors to consider" in making a *Miranda* custody determination "are whether the suspect was questioned in familiar or at least neutral surroundings," "the number of law enforcement officers present at the scene," "the degree of physical restraint placed upon the suspect," and "the duration and character of the interrogation." *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (internal citations and quotations omitted).

The Court readily determines Mr. Sayles was in custody because, at the time law enforcement questioned him regarding whether there was a firearm in 34 Charles Street, he was formally under arrest, handcuffed, surrounded by multiple state and federal law enforcement officers, and, thus, not free to leave. *See e.g.*, *Suppression Tr.* 17:16-18; 19:20-25. *Beheler*, 463 U.S. at 1125. The Court also notes that the

Government concedes that Defendant "was placed under arrest and so was in custody." *Gov't's Opp'n* at 5.

The Court thus proceeds to the second question of whether Mr. Sayles was subject to an interrogation while he was in custody. An interrogation for *Miranda* purposes includes "any words or actions on the part of the police (other than those normally attendant on arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. Under an exception to the rule, which the Government argues is relevant here, law enforcement officers are not required to give *Miranda* warnings before asking "questions reasonably prompted by a concern for the public safety." *New York v. Quarles*, 467 U.S. 649, 656 (1984). In *Quarles*, the Supreme Court considered a case in which "[t]he police . . . , in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket." *Id.* at 657. The *Quarles* Court observed, "[s]o long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it," and concluded that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* The Supreme Court clarified

13

that "the availability of the exception does not depend upon the motivation of the individual officers involved." *Id.* at 655-56.

Applying *Quarles*, courts in this District have permitted police to question an arrestee without first giving *Miranda* warnings in circumstances where the police reasonably believe doing so will protect them or the public from an immediate danger, like a concealed weapon. *See, e.g., United States v. Clark*, Crim. No. 4-44-B-W, 2007 U.S. Dist. LEXIS 35618, at *14-15 (D. Me. May 10, 2007) (determining officers' questioning of a defendant subjected to a search warrant about the location of his gun was "well within th[e] public safety exception," as an unaccounted for gun posed a risk to officer safety) (citing *Quarles*, 467 U.S. at 659); *United States v. Fisher*, 929 F. Supp. 26, 29 (D. Me. 1996) (determining officers' questioning of defendant concerning the whereabouts of his gun was permissible pursuant to the public safety exception because officers had a reasonable concern for their own safety and the safety of children who play in the vicinity of where the gun was dropped).

Here, the Court concludes Mr. Sayles's answers to the questions law enforcement officers posed to him while in custody regarding a gun on his person and inside his residence are admissible under the public safety exception to the *Miranda* regime. Although the Court agrees with Mr. Sayles that law enforcement, upon questioning, "knew that the Defendant was prohibited from possessing firearms due to his felony convictions," *Def.'s Mot.* at 15, and, thus, officers knew or should have known their questions were "likely to elicit an incriminating response," *Innis*, 446

14

U.S. at 301, "the availability of the [public safety] exception does not depend upon the motivation of the individual officers involved." *Quarles*, 467 U.S. at 656.

Instead, the operative inquiry under *Quarles* is whether law enforcement's questions were "designed *solely* to elicit testimonial evidence from the suspect." *Id.* at 659 & n.8 (emphasis supplied). Here, at the time law enforcement executed the arrest warrant for Mr. Sayles, the record indicates officers believed he was affiliated with a violent gang and, further, that he individually was known to possess firearms. *Suppression Tr.* 10:3-18 (gang affiliation), 10:25-11:8 (firearm) (ECF No. 134); *see United States v. Simpkins*, 978 F.3d 1, 10-11 (1st Cir. 2020) (affirming district court's determination that officers' questions arose out of an objectively reasonable concern for officer safety, including that the defendant owned firearms and other weapons).

Furthermore, when law enforcement questioned Mr. Sayles, they heard voices coming from inside his apartment and, thus, feared that one of his affiliates might be inside the apartment with access to a firearm. *See e.g.*, *Suppression Tr.* 20:1-23:3. The Defendant contests the reasonableness of this concern, and points to Ms. Finch's statement to law enforcement that 34 Charles Street was unoccupied besides Mr. Sayles.

Nevertheless, there are several factors here that corroborate the officers' safety concerns. They include Mr. Sayles's gang affiliation, his prior known possession of a firearm, his suspected involvement in drug distribution, law enforcement knowledge that 34 Charles Street was being used for drug trafficking, Mr. Sayles's prior extremely violent encounter with two other drug dealers in July

15

2023, his alleged use of a firearm to shoot someone in the leg about five days before the July 2023 incident, officers hearing voices from inside the house, and the Defendant's failure or refusal to respond to their question regarding additional occupants. Taken as a whole, the Court concludes that the officers' safety concerns were reasonable.

Based on the foregoing, the Court concludes the officers' questions to Mr. Sayles related to an "objectively reasonable need" to address an "immediate danger" and were not "designed solely to elicit testimonial evidence from the suspect." *Quarles*, 467 U.S. at 659 & n.8. The Court concludes the officers did not violate the Fifth Amendment and thus denies Mr. Sayles's motion to suppress his custodial statements to law enforcement.

### B.    The Fourth Amendment Issue

#### 1.    Legal Standard

The Fourth Amendment generally proscribes warrantless searches of a person's home, providing:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized.

U.S. CONST. amend. IV. Although the prohibition of warrantless searches is not absolute, a warrantless search "involving an intrusion into someone's home is presumptively unreasonable under the Fourth Amendment." *United States v. Beaudoin*, 362 F.3d 60, 65 (1st Cir. 2004) (citations omitted). Privacy expectations

for one's own home are "quite strong," and, therefore, searches "usually may not be made in a person's home unless the police have obtained a search warrant based on probable cause." *Id.* (citations omitted); *see also id.* at 72-74 (LIPEZ, J., dissenting) (stating that the Fourth Amendment has drawn a firm line at the entrance to the house and absent exigent circumstances, that threshold may not reasonably be crossed without a warrant); *accord Payton v. New York*, 445 U.S. 573, 589-90 (1980).

There are "a few specifically established and well-delineated exceptions" to the warrant requirement, including the exception that police may enter a private premises and conduct a search if "exigent circumstances" mandate immediate action. *Katz v. United States*, 389 U.S. 347, 357 (1967); *Kirk v. Louisiana*, 536 U.S. 635, 638, (2002). The exigent circumstances usually recognized include: (1) risk to the lives or health of the investigating officers; (2) risk that the evidence sought will be destroyed; (3) risk that the person sought will escape from the premises; and (4) "hot pursuit" of a fleeing felon. *See, e.g.*, *Beaudoin*, 362 F.3d at 66; *see also Johnson v. United States*, 333 U.S. 10, 14-15 (1948); *United States v. Wilson*, 36 F.3d 205, 209 (1st Cir. 1994). In *Beaudoin*, the First Circuit recognized a fifth exigent circumstance exception to the warrant requirement: "an emergency situation in which the police must act quickly to save someone's life or prevent harm." *Beaudoin*, 362 F.3d at 66.

Under any of these exceptions, the test to determine the sufficiency of the purported exigency is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant. *United States v. Bartelho*, 71 F.3d 436, 442 (1995). In *Bartelho*, the Supreme Court explained:

17

> This necessarily fact-based inquiry . . . requires that we consider factors including the gravity of the underlying offense, whether a delay would pose a threat to police or the public safety, and whether there is a great likelihood that evidence will be destroyed if the search is delayed until a warrant can be obtained.

*Id.* (internal citations omitted).

The Government bears the burden of proving by a preponderance of the evidence that a warrantless entry falls within an established exigent circumstance exception. *United States v. Jeffers*, 342 U.S. 48, 51 (1952); *accord United States v. Rutkowski*, 877 F.2d 139, 141 (1st Cir. 1989). Once in a person's home pursuant to a legitimate exigent circumstance, police officers may seize any evidence in plain view. *See Michigan v. Tyler*, 436 U.S. 499, 509-10 (1978); *United States v. Holloway*, 290 F.3d 1331, 1340 (11th Cir. 2002).

### 2. Discussion

In this case, the Government seeks to justify the warrantless search of 34 Charles Street on the following grounds: (1) officers had probable cause to search 34 Charles Street before the initial warrantless search and, thus, the discovery of items was inevitable, (2) Mr. Sayles consented to officers entering the apartment to retrieve his clothing and medication and, when officers entered for this purpose, they observed a firearm in plain view, and (3) as a "protective sweep."[4] The Court in this order

---

[4] The Government wisely does not contest Mr. Sayles's standing to challenge the search of 34 Charles Street, Unit A, which the record indicates was Mr. Sayles's girlfriend's apartment and where Mr. Sayles resided at the time of the sweep. In a similar case, the Supreme Court determined a defendant had a reasonable expectation of privacy in "[an] apartment [that] belonged to a friend [of the defendant] . . . who had given him the use of it, and a key, with which petitioner had admitted himself on the day of the arrest," concluding that "[d]istinctions such as those between 'lessee,' 'licensee,' 'invitee' and 'guest,' often only of gossamer strength, ought not to be determinative in fashioning procedures ultimately referable to constitutional safeguards." *Jones v. United States*, 362 U.S. 257, 259, 266 (1960). Here, Mr. Sayles reports that although 34 Charles Street was owned by his

18

addresses only the Government's first argument, as it is decisive in resolving the issue.

### a.   Inevitable Discovery

"[E]vidence derived from unlawful searches is generally subject to suppression," *United States v. Scott*, 270 F.3d 30, 42 (1st Cir. 2001); however, under the inevitable discovery rule, "the exclusionary rule does not bar the use of unlawfully obtained evidence in 'any case in which the prosecution can show by a preponderance of the evidence that the government would have discovered the challenged evidence even had the constitutional violation to which the defendant objects never occurred.'" *United States v. Cordero-Rosario*, 786 F.3d 64, 73 (1st Cir. 2015) (quoting *Scott*, 270 F.3d at 42); *accord Nix v. Williams*, 467 U.S. 431, 440-48 (1984). The First Circuit instructs that there are three questions in evaluating whether the inevitable discovery exception applies: "first, whether 'the legal means [are] truly independent'; second, whether 'both the use of the legal means and the discovery by that means [are] truly inevitable'; and third, whether 'the application of the inevitable discovery exception either provide[s] an incentive for police misconduct or significantly weaken[s] fourth amendment protection.'" *Scott*, 270 F.3d at 42 (citing *United States v. Silvestri*, 787 F.2d 736, 744 (1st Cir. 1986)).

---

girlfriend, he kept clothes and other belongings there, including his social security card, he was arrested there, his girlfriend told officers he resided there, some of his mail was found there, and he listed 34 Charles Street as his address on his medical records and his financial affidavit in this case. *Def.'s Mot.* at 8 (citing *Fin. Aff.* (ECF No. 10)).

With respect to the first prong, the *Silvestri* Court emphasized that "the legal means of obtaining the evidence [must] be both inevitable and independent." *Silvestri*, 787 F.2d at 746. Here, the Government argues law enforcement had probable cause to search because "before entering the apartment (whether for the protective sweep or with the defendant's consent), the defendant, a known convicted felon, said he had a gun in the house," and, "[a]t this point, law enforcement had probable cause to search the residence for evidence of the defendant being a felon in possession of a firearm." *Gov't's Opp'n* at 13; *Gov't's Suppl. Opp'n* at 2.

The Court agrees. As Mr. Sayles concedes, at the time law enforcement questioned him on the porch prior to their entry to the residence, "[l]aw enforcement knew that the Defendant was prohibited from possessing firearms due to his felony convictions." *Def.'s Mot.* at 15. He also admits that he told law enforcement upon his arrest that there was a firearm inside 34 Charles Street and, although the Court has concluded law enforcement did not violate the Fifth Amendment by asking him for this information before providing *Miranda* warnings, "failure to give adequate *Miranda* warnings does not require suppression of the physical fruits of those unwarned statements." *United States v. Hinkley*, 803 F.3d 85, 91 (2015) (citing *United States v. Patane*, 542 U.S. 630, 634 (2004)). Thus, even if the Court had not resolved the Fifth Amendment issue in the Government's favor, Mr. Sayles's statement to officers regarding the gun would very well still have provided probable cause to search 34 Charles Street for evidence of a firearm.

On the second factor, where "the police had ample evidence to establish probable cause sufficient to obtain a warrant . . . [t]hat such a warrant would have been sought is a matter of looking at predictable investigatory techniques." *United States. v. Thurston*, 774 F. Supp. 666, 668 (D. Me. 1991). This observation is applicable here. Indeed, officers obtained an arrest warrant for Mr. Sayles and then spent over six months conducting surveillance of the Defendant and, among other locations, 34 Charles Street. Law enforcement had information that he had a history of drug trafficking and involvement in a violent gang. It is thus "a matter of looking at predictable investigatory techniques," *id.*, to conclude that a search warrant for 34 Charles Street, Mr. Sayles's known residence, "would have been sought." *Id* (emphasis omitted).

Regarding the third factor, the *Silvestri* Court recognized, "[t]he fact that a warrant has been obtained [after the initial warrantless search] removes speculation as to whether a magistrate would in fact have issued a warrant on the facts and also ensures us that the [F]ourth [A]mendment has not been totally circumvented." *Silvestri*, 787 F.2d at 745; *see also United States v. Almeida*, 748 F.3d 41, 49-50 (1st Cir. 2014) (finding that "the exception will not incentivize unconstitutional behavior" where the earlier unlawful action "gave the police no particular investigative advantage"). Here, after law enforcement entered 34 Charles Street and observed evidence of criminality, they abided by the Fourth Amendment by seeking and obtaining a search warrant.

Based on the foregoing, the Court concludes the Government has satisfied its burden to show by a preponderance of the evidence that, given the facts available to the officers prior to the search, a search warrant would have been inevitably sought, and granted, and the specific articles of evidence found. *Silvestri*, 790 F.2d at 745-46. Having concluded the Government has established the admissibility of the items seized from 34 Charles Street, the Court need not reach the Government's alternative arguments and thus dismisses Mr. Sayles's motion to suppress.

## IV. CONCLUSION

The Court DISMISSES without prejudice Steven Sayles's Motion to Suppress Evidence (ECF No. 74) and Defendant's Supplemental Motion to Suppress (ECF No. 137).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 8th day of June, 2026

22